## NEW YORK SPECIAL TERM.
### 1848.
#### Before EDMONDS, Justice.

---

### THE PEOPLE, ex rel. GRIFFEN, v. STEELE AND OTHERS.

Mandamus lies to compel the trustees of a church, incorporated under the general statute relative to religious societies, to admit to the pulpit and parsonage a minister duly appointed thereto, conformable to the discipline and system of government of that particular denomination.

Though a mandamus when issued to a judicial officer merely directs him to proceed, when issued to a corporation or ministerial officer, it directs also the manner in which he shall proceed.

The existence of another and an adequate remedy is no objection to an award of mandamus against corporations and ministerial officers.

A writ of error does not supersede the execution of a peremptory mandamus.

THE Centenary M. E. Church, in Brooklyn, was organized in the year 1839, as a society of the Methodist Episcopal Church, in the United States; and under the statute its male members elected from among their number nine trustees, who

became, by virtue of such statute, a corporation with power as trustees to hold property for the use of the church, and to manage its temporalities. They, by contributions obtained from the members and friends of the Methodist Episcopal Church in various places, as well as from members of this society, raised funds for the purpose of erecting a house of worship, and with these funds purchased a site and proceeded to erect a meeting-house and parsonage upon it. The deed of the property was in the ordinary form of conveyances of real estate, without any trust being declared on its face, and by it the land was conveyed to "*the trustees of the Centenary Methodist Episcopal Church, in the city of Brooklyn*," as an estate in fee simple, the meeting-house erected on the land, having been completed, was dedicated by one of the bishops of the church, and thereupon became the place of worship for the society, and the parsonage, erected on a part of the same land, became the residence of the preachers of the society, as they were from time to time appointed to the station by the bishop.

From the organization of the society till May, 1847, it had been regarded as one of the societies of the Methodist Episcopal Church, and had been supplied with preachers from the New York Conference, by annual appointments by the bishops. At the sessions of that conference in May the period for which an appointment had been made the year previous expired, and it became the duty of the bishops to make a new appointment; but before the day for making such appointment, the conference suspended from the ministerial office John C. Green, one of their number, and who during the year previous had been appointed by the bishop at this station. As soon as the suspension of Mr. Green was known, a majority of the trustees assembled, and resolved that they would receive no preacher from them, and so notified the bishop. Mr. Green then notified the presiding elder of the district that he had withdrawn from the Methodist Episcopal Church; and these trustees then employed him, by contract, to preach in the meeting-house for a year, and gave him permission to occupy the parsonage. There was no claim that, either by any act of the members or

of the trustees, the society had withdrawn from the Methodist Episcopal Church, but on the contrary they claimed still to be a Methodist Episcopal society; it appeared, however, that a majority of the male members justified the trustees in their course. The bishop in this state of the case appointed Rev. Benjamin Griffen as the preacher in charge of this church, but on going to his appointment on the next Sabbath, he was met at the church door by the trustees, and prohibited from entering the meeting-house, and notified by them that he should not occupy the pulpit or altar, or officiate as the preacher or pastor of that church, as they had employed said Green as their minister. They also denied him the use of the parsonage.

Whereupon he applied to the court for an alternative mandamus, which was issued in the following words:

SUPREME COURT.

The People of the State of New York, to

William Steele, William Pettit, Richard Smith, Potter J. Thomas, Benjamin F. Thomas, William Barker, and James Pettit, who, with William H. Seeley and Richard Lawrence, are the trustees of the Centenary Methodist Episcopal Society, or Church, in the city of Brooklyn, in the county of Kings, and as such constitute and are established as a corporation in said city and county, by the name of "The Centenary Methodist Episcopal Church in the city of Brooklyn," and to "The Centenary Methodist Episcopal Church in the city of Brooklyn," greeting:—

Whereas, it has been made to appear to us, in our Supreme Court, at a special term thereof, held at the City Hall in the city of New York, and there in session on the eighth day of September, one thousand eight hundred and forty-seven, by the affidavits of Benjamin Griffen, Isaac Hartt, Benjamin Van Velsor, Frederick R. Anderson, J. W. White, and S. Halstead, together with the documents and papers to the affidavit of said Griffen annexed, to us in our said court there

presented : That the Methodist Episcopal Church in the United States is, and during all the time herein referred to and set forth has been, a church or denomination of professing Christians, established and composed of individuals, men and women, voluntarily associated as members thereof, in numerous societies in all parts of the United States, and especially in the State of New York, in conformity to certain rules of discipline and laws, denominated "The doctrines and discipline of the Methodist Episcopal Church," which contain the doctrines and discipline of government of said Methodist Episcopal Church, a copy of which has been to us there, in our said court, presented.

That, according to said rules of discipline and system of government, the government of said Methodist Episcopal Church is vested in one delegated general conference, a limited number of annual conferences, and an indefinite number of quarterly conferences, all composed as herein named; and is administered by certain officers vested with the powers herein stated, that is to say, by superintendents or bishops, traveling preachers, or preachers in charge of circuits or stations, with their assistant ministers, local preachers, exhorters, class leaders and stewards.

That the traveling preachers, or preachers in charge of circuits and stations, within the several territorial divisions into which their field of labor is divided, compose the annual conferences of such divisions ; and certain selected delegates from said several annual conferences compose the general conference of said Methodist Episcopal Church.   That said annual conferences, at places designated within their respective territorial limits, and, at times appointed, meet annually for the transaction of the business committed to their charge ; and said general conference, at a time and place designated, meets once in four years, as the legislative council for the whole church, and for the transaction of business committed to their charge.

That the several societies or churches, interchangeably denominated societies, churches, circuits and stations, within the limits of the several annual conferences, are associations united

as parts or branches of one common church, subject to its common government, and regulated and controlled in their separate actions and relations by its general laws. That in said general conference alone is vested the authority to prescribe or change the rules of discipline of said Methodist Episcopal Church, and to ordain laws binding upon its members; and that it is by rules prescribed by said general conference alone that the several organizations and associations of the church are governed. That said several societies or churches are divided into classes, of from twelve to about thirty members in each, chiefly for religious purposes, varying according to circumstances, in number, one of whom in each class is designated and appointed as its class leader, and a number of the members of each society or church are designated and appointed as the stewards thereof, and the duties and powers of the whole are defined and prescribed by the said rules of discipline.

That the class leaders and stewards of each society, or church, or circuit, or station, with any local preachers or exhorters who may happen to belong thereto, together with the traveling preacher who may, for the time being, have been designated and appointed as the preacher in charge thereof, and a traveling preacher designated as the presiding elder over the societies or churches, in a convenient designated district, compose a quarterly conference, for such society, church, station, or circuit; except that in some instances, for the sake of convenience, two or more contiguous churches or societies are embraced in one such quarterly conference.

That all preachers of said Methodist Episcopal Church are selected from among the members of these separate churches or societies, and licensed as preachers by the quarterly conferences thereof; and the members of the several annual conferences, are preachers so selected and licensed, and by said quarterly conferences recommended, and upon such recommendation by such annual conference received as traveling preachers; and that no man, under any circumstances, becomes a traveling preacher in any annual conference, or

acquires the right of being stationed as the pastor of a particular church, society, circuit, or station, but by the action of the representatives of the membership in quarterly conference, in first giving him a license, and then, after trial, in recommending him to an annual conference for admission as a traveling preacher.

That the annual conferences, one of which is the New York Conference, choose from their own number delegates to the General Conference, who assemble as the representatives of the whole church, and, so assembled, choose and set apart such number of ministers as are found necessary, as general superintendents or bishops of the whole church. That the respective societies or churches of said Methodist Episcopal Church have, or are entitled to have, a minister or preacher in charge to perform divine service, preach the gospel, and administer the discipline of the church, which minister, according to the tenets and discipline of said church, must be appointed from among the ministers belonging to, and in connection with, the annual conference within which such societies or churches respectively belong, or from among the ministers of some other annual conference of said Methodist Episcopal Church, by a transfer thereto for that purpose.

That the ministers of said Methodist Episcopal Church are entitled to be distributed and appointed as the ministers of said several societies or churches, and are under obligations to discharge the duties of ministers and preachers to the several societies or churches to which they are respectively appointed. That the appointment of ministers to said several societies or churches is, by the constitution and discipline of said Methodist Episcopal Church, vested in the superintendents or bishops thereof, and it is the right and duty of said bishops respectively to preside according to an arrangement and distribution of labor among themselves, in the several annual conferences; and that it is the right and duty of the bishop presiding in any annual conference, to fix the appointments of the several preachers in such conference, for the several societies, or churches, or stations, or circuits, within the

limits thereof, and thus to designate and appoint for each and
every society or church within such limits the preacher and
pastor thereof, from among the ministers of said church, de-
nominated traveling preachers as aforesaid; and that by said
discipline it is the duty of said ministers, thus appointed, to
go to their respective appointments, and discharge the duties
thereof; and that it is the duty and obligation of said socie-
ties or churches to receive as their preachers and pastors, re-
spectively, the ministers for them thus respectively appointed
for the time designated by the said bishop. That by said
appointment to any society or church of a minister, he there-
by becomes the pastor thereof, with all the rights, privileges,
and appurtenances thereto belonging, and he is entitled to
receive from such society or church, according to said disci-
pline, the fixed sum of two hundred dollars a year, with an
additional sum for each of his children below a specified age,
besides a sum to be ascertained by the stewards thereof, suffi-
cient for the payment of his necessary expenses; and that
such compensation and expenses are secured to such preacher
by a rule of said discipline, requiring collections for that pur-
pose to be made weekly from the members in the several
classes of such society or church, and the right to take up col-
lections therefor in the congregation when necessary, and
that, in case of deficiency, he is entitled to receive such defi-
ciency, in a prescribed proportion, out of a certain fixed and
established fund belonging to all the ministers of the Metho-
dist Episcopal Church connected with the several annual con-
ferences, which compensation is made dependent upon the
performance by him of the duties of his said appointment.
That, by the tenets and discipline of said Methodist Episcopal
Church, the use of the pulpit and altar of each society or
church thereof, belongs to the minister appointed thereto by
the bishop as aforesaid, during the period of his said appoint-
ment, for the purpose of preaching the gospel, and adminis-
tering the ordinances and discipline of said church therein,
and that it is his right and duty so to occupy the same for
that purpose, and he is considered as having an interest there-

in, and in his said appointment and office, and a right to the emoluments belonging thereto, upon his performing the duties thereof. That the itinerancy of the ministry, by which the ministers have agreed to submit the selection of their fields of labor, and the societies the selection of their preachers, to a common superintendency, is one of the fundamental tenets and chief peculiarities of the Methodist Episcopal Church, and by the discipline thereof the appointment of ministers by the bishops for the societies or churches of said Methodist Episcopal Church, is the only mode of selection known to said church, except that, in the absence of the bishop, a presiding elder is in some cases empowered to act in his stead. That according to the tenets and discipline of said Methodist Episcopal Church, the houses of worship of the several societies or churches thereof are required to be built with free seats, and to be so held in trust as to permit such ministers and preachers belonging to the Methodist Episcopal Church, as shall from time to time be duly authorized by the General Conference, or by the annual conferences, to preach and expound God's holy word, and to execute the discipline of the church therein.

And, whereas, it has been made to appear to us, as aforesaid, that on or about the first day of September, one thousand eight hundred and thirty-nine, sundry members of the said Methodist Episcopal Church, then and before that time connected with other societies or churches thereof, in said city of Brooklyn, and elsewhere, associated as a new society or church of said Methodist Episcopal Church, under and according to the discipline thereof, and under an express agreement by all the members thereof, and with the express design, that said society or church should be governed in all respects by said discipline, and especially that part thereof vesting the appointment of preachers for their respective stations in the bishops of said church, and providing that the trustees of the houses of worship should permit them to be used by preachers so appointed as aforesaid, and did then, in the absence of the bishop, and in the interval of the New York Conference,

apply to the Rev. Daniel Ostrander, then presiding elder in that district of said conference, in which was said city of Brooklyn, and having power, in the absence of the bishop, to act in his stead, to organize and recognize them as a society or church of said Methodist Episcopal Church according to the discipline thereof, to appoint for them a preacher or take the pastoral charge thereof, who thereupon did appoint said Benjamin Griffen, then and ever since an ordained elder, and a member of said conference, as the preacher and pastor thereof, until the next meeting of said conference, who did thereupon take the pastoral charge thereof—and that said society did then, under his charge, become a society or church of said Methodist Episcopal Church, in said conference, subject to the government and discipline thereof, and that at the first meeting of said conference thereafter the bishop presiding therein reappointed the said Benjamin Griffen to said society or church, for one year longer, as preacher and pastor thereof. That said society or church having become established as a society or church of said Methodist Episcopal Church, did meet from time to time for public worship, under the pastoral charge of said Griffen, and while so continuing, in pursuance of legal notice, the male members thereof did afterward, namely, on the eighteenth day of November, one thousand eight hundred and thirty-nine, come together at their usual place of worship, and, in pursuance of the provisions of the statute in such case provided, and herein referred to, did then elect nine trustees to take charge of the estate and property belonging to said society or church, and to transact the affairs relative to the temporalities thereof, to wit: Jonathan B. Ostrander, Frederick R. Anderson, William Pettit, William Steele, Isaac Hartt, Richard Lawrence, Thomas Taylor, Chester Bedell, and Benjamin Van Velsor, all of whom were members of said Methodist Episcopal Church, and said trustees so elected as trustees of said Centenary Methodist Episcopal Church of Brooklyn, did accept said trust, and, by the proceedings had thereon, did become a corporation by the name of "The Centenary Methodist

Episcopal Church in the city of Brooklyn," according to the act entitled "An act to provide for the incorporation of religious societies, passed April 5th, 1813," for the purposes therein stated, and with the powers thereby conferred upon trustees incorporated by virtue thereof, which proceedings in the premises were duly certified and recorded, according to said act, and have been to us in our said court there presented.

And, whereas, it has been made to appear to us, as aforesaid, that said corporation, in the mode prescribed by said act, has ever since been perpetuated, and still exists, as such; and that William Steele, William Pettit, William H. Seeley, Richard Smith, Potter J. Thomas, Benjamin F. Thomas, William Barker, Richard Lawrence, and James Pettit, are, and at the time of the grievances herein stated were, the trustees of said society, or church, elected as such, and composing said corporation, and the successors of said persons first chosen. That after the organization of said society, or church, and the appointment for them of a preacher, the members thereof having met in a place called Classic Hall, and having resolved to build a house of worship, with free seats, and to be held subject to the discipline of said Methodist Episcopal Church, the said trustees, after their election and incorporation as such, on the eighteenth day of November, one thousand eight hundred and thirty-nine, prepared and issued to the members of the Methodist Episcopal Church in the United States a subscription paper, representing their purpose of so building a house of worship, in said Brooklyn, with free seats, and to be subject to said discipline, and soliciting subscriptions for the purpose, on those terms, and upon the faith of those representations; and upon those terms, and for that purpose, obtained from the members of said Methodist Episcopal Church, in various places, large sums of money, and with funds thus obtained, and otherwise, they afterward, to wit, on the thirtieth day of November, one thousand eight hundred and thirty-nine, purchased as a sight for a house of worship, for said society, or church, the lot at the corner of Jay and Johnson streets in said Brooklyn, sixty feet front, and one hundred

feet deep, and built thereon the meeting-house now thereon standing, known as the Centenary Methodist Episcopal Meeting-house, as and for a house of worship, to be held and used as a Methodist Episcopal Meeting-house, according to the discipline of said Methodist Episcopal Church: and also built on one part thereof the parsonage now thereon standing, for the use of the minister, for the time being, of said society or church. That said lot having been purchased for said purpose, was afterward, to wit, on the twenty-first day of December, one thousand eight hundred and thirty-nine, by William L. Johnson and wife, of whom it was purchased, by deed, in the common form of conveyances of real estate, conveyed to said trustees, as a corporation, incorporated as and for the purpose aforesaid, and that it was then expressly understood by all the parties, that they received said property to hold in trust for the said society, or church, as a society, or church, of said Methodist Episcopal Church, to be used as a place of worship therefore, and to be subject to the discipline of said church, which said subscription paper, contract of purchase of said lot, and a copy of said deed, have been to us in our said court there presented.

And, whereas, it has been made to appear to us, as aforesaid, that said house of worship, having been completed, was dedicated to the worship of God, by one of the bishops of said church, and became, and has ever since continued to be, the place of worship of said Centenary Methodist Episcopal Society, or Church, and that the pulpit and altar thereof were taken possession of by the preacher appointed in charge of said society, or church, as aforesaid, and were occupied by him during the time for which he was then appointed, and that the same have ever since been occupied by preachers of said New York Conference, successively appointed by the bishop, according to the discipline of said church; and that said society, or church, has ever since continued to receive and support the preachers so successively appointed for them, and to be governed by said discipline, and to be a society of said Methodist

Episcopal Church, subject to its discipline, and governed by its laws.

And, whereas, it has been made to appear to us, as aforesaid, that in May, 1847, at the time of the appointment of said Griffen to said Centenary Methodist Episcopal Society, or church, as hereinafter stated, there were three hundred and fifty members thereof, the great portion of whom were and are attached to the doctrines, discipline and government, of said Methodist Episcopal Church, and unwilling to secede therefrom, or to sanction any unlawful acts, tending to deprive them of their membership in said church. That said trustees were elected, and made a corporation, to hold, as trustees, the said meeting-house, as and for a Methodist Episcopal Meeting-house, and to permit the ministers of said conference, appointed thereto from time to time, according to said discipline, to occupy the pulpit and altar thereof, and, as trustees, to transact the temporal affairs of said society, or church, as a Methodist Episcopal Society; and that said trustees, as such corporation, have so continued to hold said meeting-house, and permit it so to be used, and did so continue to transact said temporal affairs, till on or about the twenty-seventh day of May, one thousand eight hundred and forty-seven, and ought still so to hold the same.

And, whereas, it has been made to appear to us, as aforesaid, that the office of minister, preacher, or pastor, to said religious society, or church, in the meeting-house thereof, called the Centenary Methodist Episcopal Church, in the city of Brooklyn, as aforesaid, a society of said Methodist Episcopal Church, in said city of Brooklyn, in the county of Kings, is an office to which is appurtenant a fixed, certain pecuniary benefit, profit, and advantage, belonging to, and to be enjoyed by, the minister of said Methodist Episcopal Church, and of said New York Conference, for the time being, nominated and appointed to said place and office, and exercising the duties thereof, according to the tenets, discipline, and law, of said church; that, on the twenty-seventh day of May, one thousand eight hundred and forty-seven, the said New York Con-

ference then being in session, and the pulpit of said meeting-house of said Centenary Methodist Episcopal Society, or Church, in Brooklyn, in the county of Kings, and the office of minister, preacher, or pastor, to said society, or church, in said meeting-house, then becoming vacant, by the expiration of the period for which John C. Green, a minister of said Methodist Episcopal Church, previously occupying the same, had been appointed, and by his suspension, by the said conference to which he belonged, from all the functions of his ministerial office; and it then being the duty and right of the bishop presiding at said conference, to nominate and appoint a preacher, minister, and pastor, to said Centenary Society, or Church, in said meeting-house, as well as to fix the appointments of the preachers of said conference for the other societies therein, the Rev. Leonidas L. Hamline, one of the bishops of said Methodist Episcopal Church, and then being the presiding bishop in said conference, and having power to act in the premises, did then nominate and appoint the said Benjamin Griffen, as preacher, minister, and ordained elder of said Methodist Episcopal Church, and a member of said New York Conference, to and in the place and office of preacher, minister and pastor, to said Centenary Methodist Episcopal Society, or Church, in said city of Brooklyn, in said meeting-house, so built, held, and appointed, for the religious worship of said Methodist Episcopal Church, assembling under the charge of ministers of said church, in said city and county as aforesaid, and by you held, as trustees as aforesaid, for the purpose aforesaid, and did designate him, said Griffen, as the preacher, and pastor in charge, of said Centenary Methodist Episcopal Society, or Church, to go to said society, or church, and in said meeting-house to preach the gospel and administer the ordinances and discipline of said Methodist Episcopal Church, for one year thereafter, and until otherwise directed by said bishop, and that he did thereupon become the preacher and pastor of said Centenary Methodist Episcopal Society, or Church, with the right to exercise

the powers and enjoy all the privileges, and bound to perform all the duties thereof.

And, whereas, the said Benjamin Griffen, by virtue of such nomination and appointment, ought by you to be admitted to the use of the pulpit and altar in the said meeting-house, for the due performance of his functions, well and faithfully to execute the said place and office, and to have, use, and enjoy, all the privileges, profits, benefits, and advantages of, and belonging to, the said place and office, including the use of the said parsonage attached to said meeting-house.

And, whereas, the said Benjamin Griffen, after such, his nomination and appointment, did go to said society, or church, to perform the duties of his said appointment, and, in due manner, desire and request to be admitted to the use of the pulpit and altar in said meeting-house, and to the use of the parsonage attached thereto, and to the office of preacher and pastor to said society, or church, to which he was appointed.

Yet you, well knowing the premises, but not regarding your duty in this behalf, have absolutely neglected and refused, and still do absolutely neglect and refuse, without any reasonable cause whatever, to admit the said Benjamin Griffen into said place and office, and to the use of the pulpit and altar in said meeting-house, and to the use and enjoyment of the privileges, profits, and advantages, belonging to said place and office, including the use of said parsonage, and have unjustly and wrongfully obstructed him, the said Benjamin Griffen, in the due performance of the duties of said ministry and pastorship, and have unjustly and wrongfully prevented him from enjoying the use of said pulpit and altar, and the use of said parsonage, and from performing the duties of said ministry and pastorship, and to that end have, in violation of your duty and trust, assembled, with about six others, making, in the whole, about twelve persons; and, again, with about fifteen others, making, in the whole, about twenty-one, without any notice to the members of said society; and, to give color to your acts, have assumed to act as a meeting of said society, or church, and, without law or right, to exclude from said

meeting-house the ministers of said conference, and to prevent any minister thereof, appointed by the bishop of said church, to occupy the same, and to prevent its being used for the purpose for which it is by you held; and, in violation of your duty, you have undertaken to separate said society from said Methodist Episcopal Church, and to deprive its members of a preacher and pastor, appointed according to said discipline, and to put into said pulpit said Green, when suspended from the ministry, and separated and withdrawn from said conference, and not a minister or a member of said church, in contempt of us, and to the great damage and grievance of him, said Benjamin Griffen, and also of divers other good and peaceable citizens of this State, being members of said Methodist Episcopal Church, dwelling in, and residing near, said city of Brooklyn, in the county aforesaid, as we have been informed by their complaint made to us, in this behalf, in our Supreme Court, held at the city hall, in the city of New York, as aforesaid, and as has been made to appear to us by the affidavits and documents aforesaid.

We, therefore, being willing that due and speedy justice should be done in this behalf (as it is reasonable), do command you, the said William Steele, William Pettit, Richard Smith, Potter J. Thomas, Benjamin F. Thomas, William Barker, and James Pettit, and each of you, constituting, with said William H. Seeley, and Richard Lawrence, the trustees of the Centenary Methodist Episcopal Church, in said city, and as such established as a corporation, by the name of "The Centenary Methodist Episcopal Church in the city of Brooklyn;" and you, the said "The Centenary Methodist Episcopal Church, in the city of Brooklyn," in said county, firmly enjoining you that, immediately after the receipt of this, our writ, or of due service thereof, you do, without delay, admit, or cause to be admitted, the said Benjamin Griffen to the use of the pulpit and altar, in said meeting-house, as minister, preacher, or pastor, there, together with all the liberties, privileges, profits, and advantages, belonging to the same, including the use of said parsonage, or that you make known to us, in and before

our said Supreme Court, at the city hall, in the city of New York, on the twentieth day of September, in the year of our Lord one thousand eight hundred and forty-seven, at ten o'clock in the forenoon, why you have not done the same, and in what manner you shall have executed this, our writ, make appear to us, in and before our said Supreme Court, at said city hall, on said day, then and there returning to us this, our writ. And this you are not to omit on peril that may befall you thereon.

Witness the Honorable JOHN W. EDMONDS, one of the justices of our said Supreme Court, at the city hall, in the city of New York, this eighth day of September, in the year of our Lord one thousand eight hundred and forty-seven.

By the court.

JAMES CONNER, Clerk.

CHILD & LUCKEY, Attorneys for relator.

To which the following return was made:

SUPREME COURT.

William Steele, William Pettit, Richard Smith, Potter J. Thomas, Benjamin F. Thomas, William Barker, and James Pettit, and "The Centenary Methodist Episcopal Church in the city of Brooklyn,"

*ads.*

The People of the State of New York, *ex rel.* Benjamin Griffen.

To the Justices of the Supreme Court of the State of New York:

In respectful obedience to the command of the writ of alternative mandamus, to the above named defendants directed, the said defendants, being trustees of "The Centenary Methodist Episcopal Church in the city of Brooklyn," and the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," do make return and certify as follows:

They deny that there is any such church known to, or in the law of the land, as "The Methodist Episcopal Church in the United States;" and they aver that there is no such church known to, or in the law of the land; but they admit that there is an association of ministers, or preachers of the gospel, residing in various parts of the United States, who in, and by, certain rules adopted by themselves, and by them denominated, "The Doctrines and Discipline of the Methodist Episcopal Church," are called and known by the name of "The Methodist Episcopal Church in the United States."

They admit that, according to said rules, the government of said church is vested in the conferences, and administered by the officers for the purpose in said writ mentioned; and that the annual and general conferences of said church are composed as in said writ is stated, and that said conferences meet at the times and for the purposes stated in said writ.

But they deny that the several societies or churches within the limits of the several annual conferences are associations united as parts of one common church, and they admit that by said rules, in said general conference alone is vested the authority to prescribe or change the rules of the said Methodist Episcopal Church, and to ordain laws binding upon its members; but they deny that it is by rules prescribed by said general conference alone that the several organizations and associations, known as and called Methodist Episcopal Churches, are governed; and they admit that said several societies or churches are divided into classes in the manner and for the purposes specified in said writ, one of whom in each class is appointed as its leader; and also that a number of members of each society or church are designated and appointed as the stewards thereof; and that the duties and powers of the whole are defined and prescribed by the rules referred to in said writ.

They admit that quarterly conferences for the several churches and stations, called and known as Methodist Episcopal Churches, are composed of the persons and officers for that purpose, mentioned in said writ, except that these defend-

ants deny that it is necessary that a preacher designated as the presiding elder should be present in order to constitute such conference; and they also deny that in order to constitute such quarterly conference it is necessary that the preacher in charge of such church should be appointed in the manner in said writ mentioned. They admit the organization of the quarterly, annual, and general conferences, to be as stated in the writ.

They admit that the annual conferences, of which the New York Conference is one, choose from their own number delegates to the general conference, who assemble as the representatives of the whole church, and choose and set apart ministers as superintendents or bishops of the whole church, as stated in said writ; but they deny that the delegates so chosen are in fact the representatives of the several churches called and known as Methodist Episcopal Churches; and they also deny that such superintendents or bishops have any lawful power or authority over said several churches; and these defendants admit that the respective societies, or churches, called and known as Methodist Episcopal Churches, have, or are entitled to have, a minister or preacher in charge, to perform divine service, preach the gospel, and administer the discipline thereof; and they admit that the discipline, mentioned and referred to in the said writ, provides for the appointment from among the ministers for that purpose, mentioned or referred to in said writ; but they deny that such minister must be appointed from among such ministers; and they also deny that such societies or churches have any legal right or title to have such minister so appointed by any such superintendent or bishop as above mentioned.

They admit that the ministers of the Methodist Episcopal Church, so far as their rights depend upon the rules adopted by and between themselves, are entitled to be distributed and appointed as ministers of said several societies or churches, and are under the obligation in that respect mentioned in said writ; but as between the said ministers and the said several societies or churches, these defendants deny that said minis-

ters are so entitled to be so distributed or appointed, unless such distribution and appointment be made at the request or with the concurrence of such societies or churches.

They admit that the appointment of ministers to said several societies or churches is in the manner mentioned in said writ, vested in the superintendents or bishops of the said Methodist Episcopal Church, and that it is the right and duty of said bishops to preside in the annual conferences, as stated in said writ; and that it is the right and duty of the bishops presiding in any annual conference to fix the appointments of the several preachers in such conference, for the several societies, or churches, or stations, within the limits thereof, provided such societies or churches shall request such appointments, or consent thereto, but not otherwise; and they admit that, by the discipline referred to in the said writ, it is the duty of said ministers to go to their respective appointments and discharge the duties thereof, if such appointments have been made at the request or with the consent of such societies or churches, but not otherwise; and these defendants expressly deny that it is the duty or obligation of said societies or churches to receive as their preachers or pastors the ministers for them thus appointed, for the time designated by the said bishops, unless such appointments have been made at the request or with the consent of such societies or churches.

They deny that, by said appointment to any society or church of a minister, he thereby becomes the pastor thereof, or that he is entitled to receive from such society or church two hundred dollars a year, or any fixed sum whatever, or any additional sum for each of his children, or any other sum whatever; but they admit that when a minister is appointed by a bishop to any such society or church, at the request of such society or church, or is received by such society or church, on such appointment, the discipline referred to in said writ authorizes the taking of collections of money, in the manner and for the purposes in said writ mentioned, provided any money shall be voluntarily contributed for that purpose; but these defendants say, that neither by the law of the land,

nor by any rule of said discipline, is or are any person or persons required or compelled to pay any money whatever to such collections.

They deny that, by the tenets and discipline of the said Methodist Episcopal Church, the use of the pulpit and altar of each Methodist Episcopal Society, or Church, belongs to the minister appointed thereto by the bishop, as stated in said writ, or that it is his right or duty to occupy the same, unless such appointment be made at the request, or with the consent, of such society or church; and they deny that he has any interest whatever in such pulpit or altar.

They deny that, by the itinerancy of the ministry, the Methodist Episcopal Societies have agreed to submit the selection of their preachers to a common superintendency; and especially do they deny that by such itinerancy the Centenary Methodist Episcopal Church in the city of Brooklyn, have submitted the selection of their preacher to a common superintendency; but they admit that the itinerancy of the ministry is one of the chief peculiarities of the Methodist Episcopal Church, and one of its tenets, according to the provisions of the rules for that purpose adopted by said ministry, for their own government, and that by such rules or discipline, the appointment of ministers by the bishops, for societies or churches, is the only mode of selection known to said Methodist Episcopal Church, except as in said writ is mentioned; but these defendants deny that that is the only mode known to the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," of selecting a minister of said church.

And they admit that, according to the tenets and discipline of the said Methodist Episcopal Church, the houses of worship of the several societies or churches thereof, or of the several Methodist Episcopal Churches, are required to be built with free seats, and to be so held in trust, as specified in the said writ, as well as for other purposes.

[The second section of the discipline as to churches was here set out at large in the return.]

They admit the organization of the Centenary Methodist

Episcopal Church to have been as stated in the writ, except that they deny that the persons composing it were members of any such church as "The M. E. Church," and say that they were members of the first, second, and third, Methodist Episcopal Churches in the city of Brooklyn.

They admit that said society associated with the understanding that they would be governed by such rules as are prescribed in said discipline, for the government of separate Methodist Episcopal Societies.

They admit that the said trustees, after their election and incorporation, and at the time for that purpose mentioned in said writ, issued a subscription paper, representing their purpose of building a house of worship in said Brooklyn, with free seats, and soliciting subscriptions for that purpose; and for that purpose obtained from members of various Methodist Episcopal Churches, in various places, sums of money; and with funds thus obtained, and otherwise, they afterward, and at or about the time for that purpose stated in said writ, purchased, as a site for a house of worship, for said church, the lot for that purpose in the said writ mentioned, and built thereon the meeting-house now thereon standing, known as the Centenary Methodist Episcopal Meeting-house, as and for a house of worship; to be held and used as a Methodist Episcopal meeting-house, according to the discipline of the Methodist Episcopal Church, so far as said discipline relates to the articles of religion, and the conduct and government of the persons who should, from time to time, compose and be the members of the said "The Centenary Methodist Episcopal Church in the city of Brooklyn;" and as should be consistent with the legal rights, duties and obligations, of the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," as a religious corporation, incorporated as above mentioned, but no further. And also built on one part thereof the building now thereon standing, now, and at all times, used as a parsonage by the minister, for the time being, of said church; and that said lot was, at the time for that purpose in said writ stated, conveyed to the said trustees, as a corpora-

tion, by William L. Johnson and wife, by a deed for that pur-
pose duly executed.

[The deed is here set out in the return, and is an ordinary
warranty deed, by Johnson and wife, to "The Trustees of the
Centenary Methodist Episcopal Church in the city of Brook-
lyn," without any trust expressed in the deed.]

They admit that said house of worship was dedicated to the
worship of God by one of the bishops of the Methodist Epis-
copal Church, and became, and has ever since continued to be,
the place of worship of the said "The Centenary Methodist
Episcopal Church in the city of Brooklyn," and that the
pulpit and altar thereof were taken possession of by the
preacher appointed in charge of said church as aforesaid, and
were occupied by him during the time for which he was ap-
pointed, and that the same have ever since been occupied by
preachers of said New York Conference, successively appoint-
ed by the bishop, according to the discipline of said church,
and that said church has ever since continued to receive and
support the preachers so appointed for them, and to be gov-
erned by said discipline so far as herein above stated, and no
further. And these defendants deny that the said "The
Centenary Methodist Episcopal Church in the city of Brook-
lyn" has been, or continued to be, a society of the Method-
ist Episcopal Church, subject to its discipline, and governed
by its laws, otherwise than as herein before stated and admit-
ted.

They say the number of members of this church, when said
Griffen was appointed, was three hundred and fifteen, and
admit they are attached to the Methodist Episcopal Church,
and unwilling to secede therefrom.

They admit that trustees were elected and incorporated to
hold the meeting-house as a Methodist Episcopal meeting-
house, as stated in the writ, but deny that they were bound to
permit ministers appointed by the bishops to occupy it.

They admit the meeting of the New York Conference, the
appointment of Mr. Griffen by the bishop, the suspension of
Mr. Green, as stated in the writ, but they deny that the pul-

pit was vacant, or that the bishop had a right to appoint for them a preacher, and they aver that Mr. Green is in the occupancy of the church and parsonage, under an agreement with them made May 27, 1847, after his suspension.

They admit that said Griffen demanded admission, and that they refused to admit him.

And these defendants, for the reasons above and hereinafter stated, expressly deny that the said Benjamin Griffen, by virtue of such nomination and appointment, ought by them to be admitted to the use of the pulpit and altar in the said meeting-house, for the purposes in the said writ mentioned, including the use of the parsonage attached to said meeting-house.

First. That they, as such trustees of "The Centenary Methodist Episcopal Church in the city of Brooklyn," did, on the twenty-seventh day of May, 1847, in compliance with a resolution passed at and by a meeting of the male members of the said church, and pursuant to a resolution passed by the trustees of said church, call, retain, and employ, the Rev. John C. Green, of the said city, an ordained minister, preacher, and elder, of the Methodist Episcopal Church (and who had been the pastor of said church for the next preceding year), as minister, preacher, and pastor, of the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," for the term of one year, at a salary of one thousand dollars for the said year; and that they admitted him to the use of the pulpit and altar as minister, and he did then enter into the use of the pulpit and altar of the said meeting-house, as minister, preacher and pastor, of the said church, and hath ever since continued, and still doth continue, to use and enjoy the same, and claims to have, and, as these defendants believe, hath the lawful right to continue in the use and enjoyment thereof until the expiration of the term for which he was called, retained, and employed, as aforesaid.

Second. That they, as such trustees, did let and rent unto the said John C. Green, the use of the parsonage attached to the said meeting-house, for the term of one year, and, in pursu-

ance thereof, the said John C. Green is in the actual use and occupation of the said parsonage.

Third. That the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," was, a number of years since, duly incorporated as a church, separate and distinct from all other churches, in pursuance of the act of the legislature of the State of New York, entitled "An Act to provide for the incorporation of religious societies," under the corporate name of "The Centenary Methodist Episcopal Church in the city of Brooklyn," and has never had any connection whatever with any other church or religious society, by any contract, covenant, or agreement of any kind, express or implied, to the knowledge or belief of these defendants.

Fourth. That said church was organized and duly incorporated for the purpose of having preached and taught therein the doctrine of the Methodist Church, as taught by the Rev. John Wesley, deceased; and that such doctrine of the said Methodist Church, and no other, has ever since been, and still is, preached and taught in said church.

Fifth. That it has been the practice of the trustees and stewards of said church annually to appoint a committee, to secure or retain the services of an ordained elder of the aforesaid Methodist Episcopal Church, in the United States; and for that purpose such committees have, from time to time, conferred with the presiding bishop, or superintendent, of the New York Annual Conference, and, from time to time, until the last New York Annual Conference, held in May, last past, procured from such bishop the appointment of an ordained elder of said church, to act as the minister, preacher, and pastor, of the said "The Centenary Methodist Episcopal Church in the city of Brooklyn," and that, in the month of May, 1846, the Rev. John C. Green was so appointed as the minister, preacher, and pastor, of said Centenary Church; that it is the usual practice of the said bishops, or superintendents, to allow the elders so appointed by them to remain two years as ministers, preachers, and pastors, of the same church, provided

their services have been satisfactory to the people of their charge for the first year thereof.

Sixth. That the services of Mr. Green were satisfactory, and a committee was appointed to obtain his appointment; that finding him suspended, they determined to receive no preacher from the conference, and so informed the bishop.

Seventh. That having called, retained, and employed, the said John C. Green, twenty-one of the male members of said Centenary Church, who were convened at a meeting, held at eight o'clock, P. M., on the twenty-seventh day of May, one thousand eight hundred and forty-seven, subscribed their names to a paper approving of the call and employment of the said John C. Green, which paper was subsequently subscribed by thirty-two other male members of said church and congregation.

Eighth. That since the service of the original writ of mandamus, they have caused a meeting of the male members of the said Centenary Church to be duly convened, and stated to them — forty-eight of said members being present — that such writ had been served, and the object and design thereof, to the end that they might ascertain their views and wishes, and at such meeting they, the said male members, adopted resolutions approving of the course of the trustees.

Ninth. That these defendants have, in all their acts and proceedings, acted in accordance with the directions or declared wishes of a large majority of the male members of the said Centenary Church.

Tenth. That no covenant, or agreement, was ever made between the trustees and the bishops, nor has any deed been executed giving the bishops the right to appoint preachers for them.

Eleventh. That the moneys raised by subscription toward the building of the church meeting-house of the said Centenary Church, as it appears by an original subscription book now in the possession of these defendants, were subscribed by the respective donors thereof under a written promise written in said book, of which the following is a copy:

530 EDMONDS' SELECT CASES.

The People, ex rel. Griffen, v. Steele and others.

" We, whose names are hereunto subscribed, promise to pay to the trustees of the Centenary Methodist Episcopal Church in the city of Brooklyn, or to such persons as they may authorize, the sums set to our respective names in the annexed list, for the purpose of aiding them in building a Methodist Episcopal Church in this city, to be known by the above named title."

Twelfth. That the trustees of the said Centenary Church have at all times claimed and exercised the right on all occasions which to them seemed proper and necessary, of controlling the use and occupancy of the pulpit and altar of said meeting-house, and determining when and what collections of money should be taken up in said meeting-house.

Thirteenth. That before these defendants called, retained and employed, the said John C. Green, as aforesaid, they were told and informed, that unless they employed said Green, the majority of the male members would leave said church, and refuse to pay any part of the expenses.

Fourteenth. That the meetings of the male members of the said Centenary Church, held on the twenty-seventh day of May, one thousand eight hundred and forty-seven, as above mentioned, were called and convened by a number of the male members of said church, and were held in a public manner, upon personal notice given on the twenty-sixth day of May, one thousand eight hundred and forty-seven, to all that could be seen and notified to attend, by the said male members who called the same, and the several persons notified being requested to notify all others whom they might see.

And these defendants do further certify, and respectfully insist, that the said Benjamin Griffen is not by the law of the land entitled to the use of the pulpit and altar of the said meeting-house as minister, preacher, and pastor there, nor to the use of the said parsonage; and, therefore, and inasmuch also as such pulpit, altar, and parsonage, have not been vacant, these defendants could not, and have not, admitted the said Benjamin Griffen to the use of the pulpit and altar of the said meeting-house as minister, preacher, or pastor there, together

The People, ex rel. Griffen, v. Steele and others.

with all the liberties, privileges, profits, and advantages, belonging to the same, nor to the use of the said parsonage, as by the said amended writ of alternative mandamus they were commanded.

    (Signed)  WM. STEELE, President.
           WILLIAM PETTIT,
           RICHARD SMITH,
           POTTER J. THOMAS,
           B. F. THOMAS,
           WM. BARKER,
           JAMES PETTIT.

Sworn before
   J. VOORHES, Commissioner of Deeds.
DIKEMAN, INGRAHAM & DIKEMAN, Attorneys for Defendants.

At the January special term of the court, 1848, *Mr. Child* and *Mr. Lord*, as counsel for Mr. Griffen, moved that the return be quashed, for insufficiency, and that a peremptory writ of mandamus issue.

In support of the motion they insisted —

First. That the alternative writ, and the return, perform the offices of a declaration and a plea, in an ordinary suit at law; that the relator's title to the pastorship of this society, and his interruption in the exercise of its duties, being fully set forth, the return must fully answer the requirements in the writ, and give a legal excuse for not obeying its commands.

Second. That the ordinary rules of pleading are applicable to this case, and the return must be examined on the same principles, and by the same rules, as it would be, if excepted to, as a plea, under a general demurrer.

Third. That the return, to be sufficient, must be certain and consistent, and must show, by direct averments, all the facts on which it relies for an excuse; that the same strictness is required as in indictments, or in returns to writs of habeas corpus.

(*Com. Bank* v. *Canal Com.* 10 Wend. 25; *King* v. *Lyme Regis*, Doug. 149; *King* v. *Liverpool*, 2 Burr. 723; *Boggs'*

*case*, 11 Coke, 93; *King* v. *Abington*, 1 Lord Ray. 559.; *King* v. *Doncaster*, 2 Burr. 738; *King* v. *York*, 5 T. R. 66; *King* v. *Hereford*, 6 Mod. 309; *Queen* v. *Norwich*, 2 Lord Ray. 1244; *King* v. *Malden*, 1 id. 481; *King* v. *Cambridge*, 2 id. 456; *King* v. *Stewards, etc.*, 8 T. R. 352.)

They also contended —

I. That the return is evasive, and is therefore insufficient. The writ avers that the M. E. Church in the United States is a church, united in societies, in conformity to certain laws, denominated "The Doctrines and Discipline of the M. E. Church." The return evades the charge in its denial, not that there is such a church, in fact, but that there is any such church known to the law. The writ avers that this church is composed of men and women, all governed by the discipline. The return evades it by saying that it is the ministers alone who are the church, and governed by the discipline. The writ sets out that the church is governed according to the discipline, in the mode stated in the writ. The return evades it, by denying, not that the discipline is so, but that it is so governed by law. Throughout the whole return there is an utter evasion of the substantial averments in the writ.

II. That the return is inconsistent and contradictory, and is, on that account, insufficient. In one place it represents this church as an association of ministers alone; in another, it admits that the members are governed by the discipline in all things except as to the appointment of preachers. In one place the Centenary Society is independent of the church — an isolated body; in another, it is united with all other Methodist Episcopal societies, so far as their individual conduct is concerned. This defect is seen in every part of this return.

III. That the return is argumentative and deceptive, and on that account insufficient. It is neither a traverse of the averments in the writ, nor a plea to them, but a commingling of both. Instead of direct, certain, averments, it is so framed as to admit of different meanings. It in no respect conforms to the well-settled rules of pleading.

IV. But waiving all exceptions to the return, as to matters

of form; and looking at the writ and return together, the pleadings admit that the Centenary M. E. Society was organized as a society of the Methodist Episcopal Church; that the funds for the erection of the meeting-house were raised to procure a Methodist Episcopal meeting-house; that the trustees were chosen and became a corporation for the purpose of holding it as such; that the land was conveyed to them as trustees of a Methodist Episcopal Church.

Upon the merits of the case they contended: —

1. That the itinerancy of the ministry, and the authority of the bishops to assign them to their respective fields of labor, constitute one of the original elements and chief peculiarities of the M. E. Church.

2. That the appointment of ministers to the various societies or stations of the M. E. Church by the bishops is the only mode of selecting ministers known to its discipline.

3. That a Methodist Episcopal Church, or society, implies, by its very terms, a church governed by this discipline, and bound to receive its preacher by the appointment of the bishops. And, of course, when the Centenary Society was organized as a Methodist Episcopal Church under this discipline, its members, by their own voluntary act and free will, submitted the selection of their preacher to the bishops of the church in an annual appointment.

4. That these trustees were chosen, and became incorporated as the trustees of a Methodist Episcopal Society; and when this meeting-house and parsonage were conveyed to them, though by an absolute deed, without any trust declared by it, the law implied a trust, and vested the property in them for the use which the subscribers to the funds intended; they received it to hold as such, and could by law convert it to no other use.

5. That the act of these trustees, in excluding the minister designated by the law of the church, was a violation of their trust; and they had no more right to place Mr. Green in the use of the pulpit and altar than they would have had to

The People, ex rel. Griffen, v. Steele and others.

appropriate the property to the dissemination of Atheism or Mormonism.

The origin and history of the M. E. Church were referred to, in connection with the ministry of Mr. Wesley, as confirming the positions taken by the counsel.

The counsel for the relator then contended:—

1. That Mr. Griffen had been lawfully appointed to this office; that there is attached to it such a pecuniary interest as to make it the subject of legal protection; that it was the duty of the trustees to admit him to the use of the pulpit, altar, and parsonage; that in excluding him, and placing in the church a man suspended from the ministry, they had not only violated the rights of Mr. Griffen, but had been guilty of perpetrating a wrong upon the entire church, and upon the community at large.

2. That a writ of mandamus, to compel them to admit the relator, was a legal and proper remedy, and that a peremptory writ, commanding them to admit him, should be now issued.

(*Rex* v. *Barker*, 3 Burr. 1265; *The People* v. *Superior Court*, 5 Wend. 114; *Doe* v. *Jones*, 5 Man. & Ry. 752; *Ex parte Nelson*, 1 Cow. 417; *The People* v. *Supervisors, etc.*, 12 John. 414; *King* v. *Blooer*, 2 Burr. 1043; *King* v. *Jotham*, 3 T. R. 575; *King* v. *Commissioners, land tax*, 1 id. 146; *King* v. *Turkey Co.*, 2 Burr.; *Runkel* v. *Winemiller*, 4 Har. & M'H. 429; *United States* v. *Kendal*, 12 Pet. 620; *Rosius* v. *Renter*, 1 Har. & J. 480; *Case of St. Mary's Church*, 7 Serg. & Rawle, 517; Angel and Ames on Corp. 429, 435–437.)

*Mr. Dikeman and Mr. Greenwood*, as counsel for the trustees, contended:—

1. That the return was sufficient.

2. That the Centenary M. E. Church was not bound to receive a preacher appointed by the bishop.

3. That a writ of mandamus would not lie in such a case.

4. That if it would lie, it could not in this case, because Green was already in possession.

5. They contended, also, that the deed of the premises being an absolute deed, and not such a deed as the discipline prescribes, the property was vested in them, and subject to their control, without any such trust as is claimed by the relator.

And now, on this day, January 31, Judge EDMONDS, before whom the cause had been argued, delivered the following opinion:

I confess that there is much in this return which would, from a mere cursory perusal, go far to at least excuse the charge of evasion and inconsistency, which was so vehemently made against it on the argument by one of the counsel for the relator. If there was enough to warrant me in declaring the charge fully made out, it would be my duty for that cause alone to decide this motion in favor of the relator, and direct a peremptory mandamus to issue to admit him to the pastorship of this church. But I cannot readily bring myself to believe that either of the respectable parties to a controversy so important as this is, would desire to have it determined otherwise than upon its substantial merits; or be willing to have the task of deciding it embarrassed by mere technicalities or useless special pleading. And as I imagine I can perceive a distinction pervading the whole return, which involves the merits, and takes from it its imputed character of evasiveness and inconsistency, I prefer looking at it in that aspect, that I may approach the more agreeable duty of attempting to decide the case according to the very right of it.

That distinction is this: The relator, in his writ and his other proceedings, uses the word "church" in various significations: at one time as denoting the whole Methodist persuasion in the United States; at another, that portion of it which is represented in their conferences; at another, as the particular society or congregation over which he claims to be pastor; and again, as designating their meeting-house, or house of worship; while the respondents, on the other hand, intend to

use it in one sense only, that of designating this particular congregation.

Hence, when the relator alleges that "the Methodist Episcopal Church in the United States is a church or denomination of Christians voluntarily associated in numerous societies," in conformity to certain rules which contain the doctrines and discipline of the said Methodist Episcopal Church; the respondents feel themselves at liberty to deny that there is any such church known to or in the law of the land, as the Methodist Episcopal Church in the United States: while they admit that there is an association of ministers or preachers who are known by that name and governed by those rules. And while they "deny that the several societies or churches, within the limits of the several annual conferences, are associations united as parts of one common church," they admit that, "by said rules, in the General Conference alone is vested the authority to prescribe or change the rules of said Methodist Episcopal Church, and to ordain laws binding on its members." And so, while they deny that the persons composing this society were, at the time of the formation thereof, members of any church known as the Methodist Episcopal Church, they aver that it was composed of persons who were then members of the *first*, *second*, or *third* Methodist Episcopal Churches in the city of Brooklyn, which said three last mentioned churches were "separate and independent churches, in no way connected with each other or with any other church."

If the respondents had contented themselves with this distinction, and had based their return solely on that, I should have been obliged to hold it evasive, because it is most manifest that they have not answered to the word "church," in the sense in which it is understood in common parlance among that denomination of Christians, nor in the sense in which it was plainly used in the writ which they were answering. But they have gone further; and while throughout they have adhered to this distinction, as perhaps a legitimate mode of presenting to the court the grounds on which they intend to

rest their defense, they have, in other parts of their return, as well as on the argument, so frankly spread out the facts of the case, as to present no insuperable obstacle to a decision on the substantial merits of the controversy.

These merits are presented in this simple form: On the one hand, it is claimed that the power of appointing a preacher to any particular congregation (involving herein both the duty of the preacher thus to officiate, and the obligation of the congregation to receive him) is vested in certain constituted authorities of the church at large, irrespective either of the wishes of the pastor or congregation; and, on the other hand, it is insisted that this is an obligation resting on the preachers alone, and not on the congregation; that this obligation springs only out of a discipline of government adopted and prescribed by the preachers alone; and while it obliges them to go where the superior authority directs them, no congregation is bound to receive them as their pastors, except of their own free choice.

The consideration of this question presents for my determination two points:

1. The nature and extent of the obligation resting on the respective parties.

2. How far it is the duty, or in the power of courts of law, to enforce this obligation, whatever it may be.

In discussing these questions, I disclaim, at the onset, all power to canvass or determine the Scriptural truth of any tenet held by this denomination of Christians, or any individual or congregation among them. I can only inquire into the tenets promulgated in the church in connection with a right of property, or a trust to be administered. The limit of the inquiry is this: Has there been an appropriation of property for the support of a church in which certain religious doctrines should be taught, and a certain discipline observed? If these objects are not contrary to law, then the next inquiry is, whether there has been an attempt to withhold the property from the uses to which it was dedicated, and whether those who now participate in the avails of the property adhere to

the doctrines it was given to sustain? My province is merely to ascertain what is, and not what ought to be, the tenets and discipline of this class of Christians; and that only for the purpose of ascertaining whether the "meeting-house" and parsonage in dispute have been dedicated to their support, and whether the acts of the respondents are calculated to withdraw them from the purposes to which they have been dedicated.

The intention of the donors is the criterion by which to determine those purposes. The grant frequently expresses it, and when it does so, clearly and unequivocally, that must govern. But in this case the conveyance is merely to the religious corporation by name, with no other designation of its purposes or trusts. In such cases, in the language of Judge GARDINER, in *Miller* v. *Gable* (2 Denio, 548), the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust. Here the corporate name in the deed is, "The Centenary Methodist Episcopal Church," etc., three words of which clearly having respect to "doctrines esteemed fundamental."

The contemporaneous acts of the corporators are equally significant.

The congregation was formed, in the first instance, of members of three other Methodist Episcopal Churches; upon their application, they were organized and recognized as a Methodist Episcopal Church by the presiding elder of that district, in the absence of the bishop, and in the interval of the annual conference; they received from him the assignment of a preacher, who officiated for them till the next annual conference, and thenceforward for a period of nearly eight years, and up to the time when this difficulty occurred, they yearly received, from the conference, such pastor as the presiding bishop designated; they became incorporated as a Methodist Episcopal Church: when they contemplated erecting their buildings, they obtained subscriptions for the purpose of aiding them in building a "Methodist Episcopal Church"; and they now admit, in their return, that they built the meeting-

house " as and for a house of worship, to be held and used as a Methodist Episcopal meeting-house, according to the discipline of the Methodist Episcopal Church, so far as the said discipline relates to the articles of religion, and the conduct and government of the members thereof, so far as the same should be consistent with their legal rights as a religious corporation."

These circumstances show to my mind, very satisfactorily, that this particular congregation was organized, and this church dedicated, with a view to the preaching of the faith, and enforcing the discipline, of the Methodist Episcopal persuasion, and that it was the intention of the founders thereof to support its tenets in subjection to the ecclesiastial power which upholds those tenets.

It was, undoubtedly, competent for the original founders of this " Centenary Methodist Episcopal Church " to have established it independent of any connection with any other professing Christians of the same denomination, and to have dedicated it to the support of particular tenets, independent of any particular form or mode of church government. Such a congregation might afterward form a union with others, and again dissolve it, without impairing their foundation, or doing more, by the dissolution, than simply restoring themselves to their former position. But there is a wide difference between such a church and one originally formed as a branch of a main body, and in subordination to its church government and discipline, from which it cannot break off without losing its distinctive character.

I entertain no doubt that the church in question was of the latter character. Every allegation and admission in the papers before me shows this, and evinces that the independence now claimed for it, by these trustees, was an after-thought, not entering into the calculation of the original founders, but springing from some subsequent considerations, which may or may not justify the separation of this branch from the main stock.

Whether the acts of the trustees now complained of, and sought to be redressed in these proceedings, tend to such a

separation; or, if they do, whether they rest on considerations sufficient to justify it, in any respect, or to any extent, is next to be ascertained.

The claim set up by these trustees is, I repeat, that their society, in respect to receiving preachers, is independent of the higher church authorities; and that it is optional with them, whether they will receive such as the bishop or the presiding elder, at the annual conference, shall appoint for them. If this may be predicated of this congregation, it may be so of every other society of the Methodist Episcopal Church in the United States; and the true inquiry is, whether the independence thus claimed for all the separate congregations of the Methodist Episcopal denomination is consistent with the rules and discipline of the main body, of which they are component parts, and consonant to the church government, in subordination to which they were originally established?

This question is by no means new to that church, nor is this the first time it has agitated its members.

It is now a little over one hundred years since Methodism first took its rise in England, under the fostering care of John Wesley, an ordained minister of the Protestant Episcopal Church of England, and about eighty years since it was first introduced into America, and began its extraordinary career among our people. For more than fifty years of that time, the question now mooted before me has been once and again agitated in its councils, but it has never, until now, that I can learn, invoked the interposition of the legal tribunals of the country.

It seems, from an early period of his labors, to have been a cardinal principle with Wesley, that the preachers, whom he sent abroad to diffuse his doctrines among men, should be independent of the people whose sins they were to condemn, and whose consciences they were to awaken; and that they should not be seduced from the apostolic task, severe, and full of privation and self-denial, as it was, to which they were dedicated, by the seductions of a permanent residence, or the allurements of an abiding home. Hence arose what, in their

language, is called the "itinerancy" of their preachers, meaning, hereby, that no preacher, having charge of a congregation, should remain at any one place longer than a brief period, ranging, at different times, from three months to three years.

Without yielding to the temptation of pausing to comment on the wisdom of a measure which has doubtless been one great element of the extraordinary success which has attended the preaching of these doctrines in this country, swelling that denomination of Christians here, in the space of eighty years, from less than a score of people to nearly a million, and which has sent their tenets forth into the wild and waste places of a new land, as co-travelers with, if not forerunners of, the hardy pioneers of the west, I pass to the remark, that this duty of assigning the preachers was, in the early years of the church, exercised by Wesley himself, both in this country and in England. In 1769 he sent over to America two persons, who were the first regular itinerant Methodist preachers who visited this country. In 1771 he sent over two more, one of whom, Mr. Asbury, in 1772, received from him an appointment as "general assistant," which meant, that as Wesley was considered as head of the whole body, both in Europe and America, the one having a circuit under him was styled his assistant, and those under the assistants were styled helpers; so Mr. Asbury, as "general assistant," was constituted the head of all the preachers and societies in America, with power to station the preachers, etc., under the general direction of Wesley himself.

From that time until his death, in 1816, a period of forty-four years, with some slight interruptions, when the authority of his office was exercised by some other person, the power of stationing the preachers in this country was exercised by Mr. Asbury, as such general assistant, or as superintendent, or bishop, or by persons appointed by him, or by him and his coadjutors in the episcopacy.

In 1789 a controversy, arising from the question now before me, sprung up in England, in what is known in their history

as " the case of the Birstal House." In Wesley's account of that matter, he says: "I built the first Methodist preaching-house at Birstal in 1739; and, knowing no better, I suffered the deed of trust to be drawn up in the Presbyterian form; but Mr. Whitefield hearing of it, wrote me a warm letter, asking, 'Do you consider what you do? If the trustees are to name the preachers, they may exclude even you from preaching in the house you have built. Pray let this deed be immediately canceled.' To this the trustees readily agreed. Afterward I built the preaching-houses in Kingswood and at Newcastle-upon-Tyne. But none besides myself had any right to appoint the preachers in them." He also says, that " whenever the trustees exert the power of placing and displacing preachers, then itinerancy preaching is no more. When the trustees in any place have found and fixed a preacher they like, the rotation of preachers is at an end; at least till they are tired of their favorite preacher, and so turn him out. While he stays, is not the bridle in his mouth? How dare he speak the full and the whole truth, since, whenever he displeases the trustees, he is liable to lose his bread? How much less will he dare to put a trustee, though ever so ungodly, out of the society?" And in 1782 he used this explicit language: "I abhor the thought of giving to twenty men the power to place or displace the preachers in their congregations. How would he then dare to speak an unpleasing truth? And if he did, what would become of him? This must never be the case while I live among the Methodists. And Birstal is a leading case, the first of an avowed violation of our plan. Therefore the point must be carried for the Methodist preachers now or never; and I alone can carry it, which I will, God being my helper."

Wesley seems to have been loth to sever the connection between his followers and the Church of England, and it was not until after the revolutionary war had dissolved all political ties between his country and ours, that he could be induced to exercise the power of ordaining ministers for his followers in this country.

But in 1784 he appointed Dr. Coke and Mr. Asbury to be "joint superintendents over the brethren in America."

Whether this word, derived from the Latin *super* and *intendere*, or the Greek *episkopos*, or the more English phrase, bishop, derived from the Saxon *bircop*, be used, the meaning of all is the same — to oversee. Connected with the office of bishop in the church of which he was a member, was the power of presentment of pastors to congregations, except where the power had been specially granted otherwise. Connected with the office of superintendent, which he created for his followers in America, was the like power of stationing ministers. In neither instance was there any power in the congregation to choose their pastor or preacher. When the missive, bearing this appointment from the great head and founder of this church, reached these shores, sixty out of the eighty-three preachers, then in the traveling connection, assembled in conference; in their own language, "became, instead of a religious society, a separate church;" elected and ordained their bishops; declared their articles of religion, and established their discipline, a part of which, affecting the question in hand, was the following:

"Quest. 2. How is a bishop to be constituted in future?

"Ans. By the election of a majority of the conference, and the laying on of hands of a bishop.

"Quest. 3. What is his duty?

"Ans. To preside as moderator in our conferences; to fix the appointments of the preachers for the several circuits; and, in the intervals of the conferences, to change, receive, or suspend preachers, as necessity may require," etc.

The power thus conferred on the bishop or superintendent has been exercised by those officers, or by persons appointed by them, among that denomination of Christians in this country, from that time until the present.

But in this country, where the practice of self-government has been attended with such happy results, and where it has been so habitual in all the relations of life as almost to become a part of our nature, it was not to be expected that the

establishment of a hierarchy like this, embracing within its authority so many thousands of our intelligent citizens, would be permitted without a struggle. Hence the history of this church is full of the efforts to overthrow, or at least to modify it.

At the first regular General Conference (which is the highest ecclesiastical tribunal among them, and which was held in 1792) it was proposed to give an appeal from the bishops in stationing the preachers to the conference.

After " a very strong debate," as it is termed, which lasted three days, the proposition was rejected by a large majority. A secession from the church followed, and for a few years its onward progress was arrested.

At the General Conference in 1800 several propositions of a similar character were made: one "that the new bishop bring the stations of the preachers into the conference, that he may hear what the conference has to say upon each station." Another "that the new bishop, in stationing preachers be aided by a committee to be chosen by the conference." But all were either withdrawn or rejected, the conference determining that the new bishop should be clothed with all the powers which had been conceded to his senior.

The same attempt in a different form, was made at the General Conferences, held in 1808, 1812, and in 1816. The form the proposition then assumed was for the conferences to elect the presiding elders, who should constitute a council to assist the bishop in stationing preachers. But it was again rejected.

The same proposition was renewed in 1820, and again rejected. In a modified form it was finally adopted, but its operation was suspended until the next General Conference, at which it was again suspended for four years more; and finally, in 1828, was rescinded.

Thus ended, for the time, a controversy which the historian of the church describes as one " which has caused more agitation in our church, and sometimes seemed to threaten more disastrous consequences, than any other which, up to that

time, had been canvassed on the floor of the General Conference."

In 1840 the question was again agitated, though more moderately, on a petition, among other things, for the election of presiding elders, which was again rejected.

I have gone thus at length into the history of the church, merely for the purpose of endeavoring to ascertain whether the question involved in this controversy is a well settled and well considered point of church government and discipline among them, and I confess I see no room for a doubt. If there was any on my mind, it would readily be removed by a recurrence to some of the considerations which were presented on both sides of the question, when it was under discussion at their various assemblages. On one side it was urged that the proposed changes were most in conformity to the genius of our people, to have a voice in the election of those who are to rule over them; that it was dangerous thus to augment the power of the episcopacy; that a preacher or a congregation ever so much oppressed in the appointments would have no redress; that it was impossible for any bishop to have all that local knowledge which is essential to enable him to make the most judicious appointments; that to give one man a control over five hundred, many of them his equals in wisdom and goodness, was an anomaly and an absurdity, finding no warrant in the Scripture, or the fitness of things, and that however easily the power might have been executed in the early period of the church, when the congregations were few, and the number of preachers small, it was impossible to execute it, either intelligibly or safely, when the persons to be affected by it were numbered by hundreds of thousands, and were spread over the whole face of the continent; and the example of the British church was cited, where, after the death of Wesley, the power of stationing the preachers had been given to a committee, with an appeal to the conference.

On the other hand, it was answered that the church of Christ was founded in some respects upon very different principles from those on which civil governments rested; that

69—vol. 1.

strengthening the power of the episcopacy was less to be dreaded than the engendering an electioneering spirit, which would give rise to agitations and strife incompatible with harmony and brotherly love; that though a particular preacher or congregation might be aggrieved in stationing him, that was a lesser evil than that which would flow from a destruction of the independence of the stationing power; that though the preachers and congregations retained their civil rights as citizens, on entering the church they became, voluntarily, subject to the restraints (not incompatible with their rights as citizens) which were essential to the preservation and efficient action of the church; that as to the limited information and want of local knowledge in the bishops, the evil was practically remedied by their receiving information from others, and acting on their own unbiassed judgment, uninfluenced by the local prejudices which would affect those who from their position were liable to be biased by partial interests and local feelings; that the control of one over five hundred was counterbalanced by the advantage of a superior knowledge of and regard for the whole, possessed rather by him whose duty it was to oversee the whole than by those who were confined in their observation to a limited sphere; and, finally, that as the itinerancy of the ministry was one of the chief instruments in the success which had attended the progress of the church, so its preservation, which was of the highest importance, could be most certainly secured when enforced rather by those who were independent of its action, than by either preachers or societies, who would be more likely to consult their own wishes and interests than the good of the whole church.

In citing these arguments I must not, for a moment, be understood as intending to intimate even an opinion as to their soundness on either side, or as expressing any judgment on the propriety of the conclusion at which the church authorities arrived on the subject. That would be quite aside from the legitimate performance of my duty. But I cite them for a very different purpose—that, namely, of solving

the question whether the power which these trustees are resisting is a fixed and undoubted principle of government in the church.

And I am irresistibly conducted to the conclusion, that the itinerancy of the priesthood, enforced by the power of the episcopacy, is now, and for more than a century has been, the well established practice of this church; is clearly defined in the "Doctrines and Discipline;" and has been again and again understandingly and advisedly justified and defended by the highest ecclesiastical tribunal known in its constitution.

This being determined, the questions occur: What was the duty of these trustees under the circumstances of this case? And how is that duty to be enforced?

The first of these questions has an intrinsic importance far beyond that which the decision of the case now in hand could give it. It has a direct bearing upon the innumerable charitable and religious societies among us, which, as was remarked on the argument, stand as monuments on the moral face of our country, to the benevolence and enterprise of our citizens, diffusing the blessings of knowledge, virtue, and piety, abroad in the land.

The mere association of any number of persons into a charitable or religious society does not of itself involve the existence of any such office as that which these trustees fill. It is only when, in order to protect their legal property or enforce their legal rights, they seek the aid of the law by an act of incorporation, that such office becomes necessary. Then it is requisite for them to have some person to represent them in their resort to legal remedies, and in the exercise of their legal rights. Hence, our general law relating to religious corporations provides that they must have a certain number of persons "to take charge of the estate and property belonging thereto, and to transact all affairs relative to the temporalities thereof" (2 R. Laws of 1813, p. 212, § 3); and those persons, called in the statute trustees, are incorporated, not the society or association whose officers they are.

It is not an easy task to draw a line which shall clearly

define the boundaries of their authority. The statute circumscribes it within the limits of the words I have quoted from its third section. Its fourth section points out their powers within those limits, yet it is by no means unfrequent for trustees to mistake the extent of their domination. Many of the cases, of a character like the present, which come before our courts of justice, display this mistake, and show a usurpation of power which properly belongs only to the ecclesiastical authorities.

Their great and paramount duty is to see that the temporalities committed to their charge are fairly and fully devoted to the purposes which the founders had in view; the intention of those founders being their polar star. All authority conferred on them is, of necessity, subordinate to this great end, and all exercise of it beyond the legitimate attainment of this end must be usurpation.

It is no excuse for any aberration from this line of duty, for such officers to say that they have been directed to it, or are sustained in it, by the majority of those to whom they owe their appointment. They are not chosen to represent that majority, but rather to execute the trust of carrying out the intention of those from whose benevolence flow the temporalities put in their charge.

If such an excuse will be ever available, where is it to stop? What shall set bounds to its encroachment? And how long will it be before the church, the parsonage, and the school-house, which owe their very existence to the desire of spreading evangelical piety, will be desecrated by the orgies of the heathen in his blindness, or the subtilties of the infidel in his madness? They, from whose benevolence has arisen some pious foundation, or some noble charity, may have passed from the stage of life, leaving behind them some such monument of their love for God and man, in the confident expectation that the trust they have confided to posterity will be faithfully executed. Upon what principle can it be justified, that they who now live to enjoy the fruits of the charity of the dead, should be permitted, at their caprice, to control, and

perhaps to divert from its original purpose, the endowment which owes none of its support to them? No such principle is known in law or morals. And it was the duty of the trustees, whose conduct is now under consideration, diligently to inquire, and faithfully to execute, the intention of those to whose contributions the estate, property and temporalities committed to their charge, owed their very creation. That intention has been easily ascertained to have been the establishment of a M. E. Church, in connection with the general church of that denomination, and in subordination to its ecclesiastical tribunals, and its "Doctrines and Discipline"; and the act of the trustees, which this court is now called upon to redress, is one of insubordination to those tribunals, and in violation of one of the most clearly defined and well considered injunctions of that discipline.

The duty of courts of law in such a case is very plain. It is to enforce the performance of such duty, unless that performance involves some violation of the law of the land.

It has been nowhere suggested, either in the return of the respondents, or on the argument, that the exercise by the episcopacy of the power of stationing the preachers, without the consent of the congregation, is in violation of law. The argument was that it was contrary to the spirit of our institutions, and the genius of our people. If this were so, the remedy is at hand, and is to be found reposing in full vigor among the very people who are alone affected by it. But is it so in fact? It is true, it is our habit, and so consonant to our institutions, for our people to have a voice in the selection of the persons who rule over them. Are the priesthood of any denomination in this country to be justly regarded, in any sense, as rulers of their people? If there is any dominion it is self-imposed, voluntarily submitted to, and may, at the pleasure of the subject of it, be at any time shaken off. It is the dominion of influence alone, that influence which, in a well ordered community, will always flow in or out of the priesthood from holy zeal, a virtuous life, and disinterested labors for the good of others. But it is a perversion of language to

speak of that as a ruling power, to be guided or controlled by popular elections, or to treat him as a ruler whose sole authority is the apostolic one of bringing sinners to repentance. There are, however, principles in our institutions which have some bearing on the matter in hand. One is fidelity to a trust reposed; a duty, the performance of which, in public or private, in the civil or religious walks of life, is nowhere more rigidly exacted than among our people. Another is, that which was so happily expressed on the argument — that in this country religion is not established, it is not tolerated — it is PROTECTED. To that protection it has an absolute right, whatever the tenets maintained or the discipline established, so that they are not contrary to the law of the land, or injurious to the public morals. That protection is now sought at the hands of this court, and it only remains to inquire whether, according to its rules and practice, it has the power to award it.

The power of this court to award the writ of mandamus in a case of this character was not directly questioned on the argument, but some considerations were suggested, which, if allowed the weight claimed for them, would amount to a denial of the power. Until the time of Lord MANSFIELD, that great vindicator of the law, who swept from its members the useless trammels with which antiquated forms had restrained the freedom of their action, this writ had been of comparatively little value. It had been called a writ of restitution, and had been confined exclusively to offices of a public nature. (Ang. & Ames on Corp. 566.) But in several cases which came before him (*Rex* v. *Blooer*, in 1759, 2 Burr, 1043; and *Rex* v. *Barker and others*, in 1762, 3 Burr, 1265), he extended its operation, first, to the case of a curate in the Established Church, next, to that of a dissenting minister, and laid down the principle that "where there is a right to execute an office, perform a service, or exercise a franchise — more especially if it be in a matter of public concern, or attended with profit — and a person is kept out of possession or dispossessed of such right, and has no other specific and legal remedy, the court ought to assist

by a mandamus, upon reasons of justice, as the writ expresses, *Nos. A. B. debitam et festinam justitiam in hac parte fieri volentes ut est justum;* and upon reasons of public policy to preserve peace, order, and good government.

And from that day that principle has been received as one firmly embodied in our law. The courts of our State have frequently acted upon it, declaring it to be proper where some legal right has been refused or violated, and there is no other appropriate legal remedy, and regarding the jurisdiction by means of it as one of immense importance and extent, belonging to this court alone, and extending to all inferior courts, tribunals, and officers, executive, ministerial, or judicial, and operating summarily, and in some instances definitely, upon most important interests. (*The People* v. *Superior Court of New York,* 5 Wend. 122; *The People* v. *Supervisors of Albany,* 12 J. R. 414; *Hall* v. *Supervisors of Oneida,* 19 id. 260; *Ex parte Nelson,* 1 Cow. 423; *Ex parte Bailey,* 2 id. 479; *The People* v. *Niagara C. P.,* 12 Wend. 246; *The People* v. *Supervisors of Columbia,* 10 id. 285; *The People* v. *Throop,* 12 id. 183; *Ex parte Jennings,* 6 Cow. 518; *Minklear* v. *Rochefeller,* 6 id. 276; *Ex parte Rogers,* 7 id. 526; *Oneida C. P.* v. *The People,* 18 Wend. 79; *The People* v. *Dutchess C. P.,* 20 id. 658.)

The extension of the authority of this writ has been adopted in other States (20 Pick. 484; 3 Hen. & Munf. 1; 4 Har. & M'H. 429), and been sanctioned by the Supreme Court of the United States. (*Kendal* v. *United States,* 12 Pet. 629.)

So far as regards inferior judicial tribunals, the operation of the writ in this State has, by the case in 18 Wend. 79, been confined simply to a mandate that they proceed; but as to corporations and ministerial officers, the authority of the writ is clearly recognized to be not only to set them a going, but to direct the mode and manner of their going. (*The People* v. *Dutchess C. P.,* 20 Wend. 658; *M'Collough* v. *Mayor, etc., of Brooklyn,* 23 id. 461.)

It was, however, objected on the argument—

1. That the relator had an adequate remedy by ejectment, and therefore this writ ought not to go; and

2. That the function of pastor of this church being already filled, it was not the province of this writ to remove the present incumbent from his possession. Both positions are unsound; the latter particularly so, because it would make the wrong done a complete barrier of itself to an adequate remedy for it.

As to the first objection, there are two conclusive answers — one is, that ejectment would not be an adequate remedy. Even if it might give the relator possession of the parsonage, how could he bring that action to obtain possession of the pulpit, or how could it give him the right to visit his parishioners, or receive his salary? And the other is, that it is well settled, as to corporations and ministerial officers, the existence of another and an adequate remedy is no objection to awarding this writ. (*The People* v. *Mayor, etc., of New York*, 10 Wend. 393; *M'Collough* v. *Mayor, etc., of Brooklyn*, 23 id. 461.)

As to the second objection, the counsel, in making it, overlook the fact that the writ of mandamus was, in its origin, a writ of restitution, and that, in an early period, it was used to restore or admit a person to an office. (11 Co. 93; 2 Sid. 112; 2 Bulst. 122; Vent. 77; Raym. 12; 2 Stra. 1023; 2 Rol. R. 82; Salk. 175; 4 Mod. 281.)

But, without multiplying authorities on this point, I will content myself with a more particular reference to two of the cases which I have cited, because they bear directly upon many parts of this case.

The case of *Runkel* v. *Winemiller* (4 H. & M'H. 430) was one where the relator, as minister of a German Reformed Christian Church, after he had been duly inducted and put in possession of his function, and the emoluments of it, for ten years, was removed. He applied for this writ, and it was objected that the person in possession had not been made a party to the proceedings. The objection was overruled, and the court lay down the broad proposition that every endowed min-

ister — that is, those to whose function emoluments are attached — of any sect or denomination of Christians, who has been wrongfully dispossessed of his pulpit, is entitled to the writ of mandamus to be restored to his function and the temporal rights with which it is endowed.

In the case of *Rex* v. *Barker* (3 Burr, 1265), the trustees had put a minister into possession, and maintained him therein against the relators. The objection was directly taken that the writ of mandamus could not be to admit where another was in possession, and a distinction was attempted between a writ to restore one who had been in possession, and to admit one who had a right, but had never been in possession.

Lord MANSFIELD, overruling these objections, held that this writ was introduced "to prevent disorder from a failure of justice and defect of police. Therefore, it ought to be used upon all occasions where the law has established no specific remedy, and where, in justice and good government, there ought to be one. If there be a right, and no other specific remedy, this should not be denied." And he adds: "Should the court deny this remedy, the congregation may be tempted to resist violence by force. A dispute, who shall preach Christian charity, may raise implacable feuds and animosities, in breach of the public peace, to the reproach of government, and the scandal of religion. To deny this writ would be putting Protestant dissenters and their religious worship out of the protection of the law. This case is entitled to that protection, and cannot have it in any other mode than by granting this writ." Guided by the principles, and following the example of this great luminary of the law, I rule in this case, as he did in that, for want of a sufficient return a peremptory mandamus must issue.

Upon the delivery of the opinion of the judge, the following order was made, as the judgment of the court, in the case:

## SUPREME COURT.

The People, *ex rel.* Benjamin Griffen,

*v.*

William Steele and others, Trustees of the Centenary Methodist Episcopal Church.

In court, January 31, 1848.

Upon reading the writ of alternative mandamus, heretofore issued, and the return thereto, in this case, and upon the affidavits and papers on which said writ was issued, and now on file in this cause, and, on motion of Mr. Child and Mr. Lord, of counsel for the relator, Mr. Dikeman and Mr. Greenwood being heard in opposition thereto,

It is ordered, that the return of the defendants to said alternative writ be quashed, and that a peremptory writ of mandamus do now issue, under the seal of this court, directed to the defendants named in said alternative writ, commanding them forthwith, and without delay, immediately, on the service thereof, to admit, or cause to be admitted, said Benjamin Griffen, an ordained elder of the Methodist Episcopal Church, to the use of the pulpit and altar in the meeting-house of the Centenary Methodist Episcopal Church, in said Brooklyn, named in said alternative writ, as minister, preacher, and pastor, there; together with all the privileges, profits, and advantages, belonging to the same, including the use and occupancy of the parsonage attached to said meeting-house named in said alternative writ; and that the said defendants pay to the relator the costs of prosecuting this suit, to be taxed.

By the Court,

Attest.                JAMES CONNER, Clerk.

The defendants immediately gave notice of a motion, to compel the filing of a record of the judgment of the court, with a view to bringing a writ of error, and obtained an *ex*

The People, ex rel. Griffen, v. Steele and others.

*parte* order to stay proceedings till that was done. The relator then filed a record, and the judge thereupon rescinded the former order staying the proceedings, leaving the order for a mandamus in force to be immediately executed.

In conformity to this order of the court, a peremptory writ of mandamus was issued, and served upon the defendants on the second day of February, A. D. 1848, commanding them without delay, immediately to admit Mr. Griffen to the use of the pulpit and altar of the meeting-house as the pastor of the church, and to the occupancy of the parsonage, as one of the appurtenances of the office. On the next day, February third, the defendants' attorneys obtained the allowance of a writ of error, and served it upon the relator, with a view to the removal of the judgment to the Court of Appeals for review, having given notice to the relator's attorneys of their intention to do so, immediately after the judgment was rendered.

On the evening of the fourth of February, the usual time for holding a religious meeting by the Centenary Church, Mr. Griffen went to the meeting-house, with a view of entering upon the discharge of his duties, and finding the defendants assembled in the vestibule, demanded of them admission, according to the command of the writ. He was informed by them that he could not be admitted; and one of them then put into his hands a letter, of which the following is a copy:

Rev. Benjamin Griffen —

Sir: The defendants having obtained the allowance of a writ of error, to remove the judgment of the Supreme Court, in the suit of the People of the State of New York, on your relation against them; and having duly executed such bond with sureties, as required by law, for that purpose; and said writ and bond, with the certificate of counsel, having been duly filed with the clerk of the city and county of New York, they are advised by their counsel, that all proceedings on said judgment are hereby stayed, and that the same is in law a supersedeas, and prevents the execution of any peremptory

writ of mandamus issued on said judgment, until said judgment is reviewed by the Court of Appeals, and by said court confirmed. They, therefore, without intending any disrespect or contempt toward you or the court from which such writ of peremptory mandamus has issued, for the reasons above stated, as well as the impossibility of revoking their contracts and agreements with the Rev. John C. Green, by which he is entitled to the use of the parsonage attached to the meeting-house of the Centenary Church, and the use of the pulpit and altar of said church, until the twenty-seventh day of May next, have directed us to inform you that they decline to take any action whatever, to admit you, or to cause you to be admitted, to the use of the pulpit and altar of said meeting-house, as minister, preacher, or pastor there, together with the liberties, privileges, profits, and advantages belonging to the same, including the use of said parsonage, until the decision of the Court of Appeals shall be had upon the said judgment.

Dated, Brooklyn, February 3, 1848.

Yours, etc.,

By order of the Board of Trustees of the Centenary Methodist Episcopal Church,

WM. STEELE, President.

G. C. Weld, Clerk.


The defendants having thus refused to obey the writ, Mr. Child, one of the counsel for the relator, on the eighth of February, presented to the court affidavits showing the fact of such service and refusal, and thereupon moved for, and obtained, a rule upon them, to show cause why attachments should not issue against them for a contempt. The rule having been served, and a time appointed for a hearing, the defendants, on the twenty-eighth of February, appeared before the court, with John Dikeman, George Wood, and John Greenwood, as their counsel, to show cause against the motion, and Asa Child, Daniel Lord, and James R. Whiting, as counsel for the relator, appeared in support of it.

*Wood & Dikeman*, for the defendants, in showing cause, contended: —

I. That inasmuch as the defendants had given notice of their purpose to bring a writ of error, the issuing of the writ of mandamus before it was brought, could impose no higher obligation to obey it, than if issued after the writ of error had been actually served. The case must therefore be viewed as one where a writ of error had been regularly allowed and served, to remove the judgment to a higher court, at the time of the issuing of this writ.

II. That a writ of error is a writ of right, and lies to review the proceedings of all courts of record, without reference to the nature of the judgments rendered. That an important matter having been determined in this case, it would be contrary to the policy of our law to deprive a party of the right of review. That there is nothing in this case to distinguish it from the ordinary cases of judgments upon which writs of error are brought.

III. That the writ of error was a *supersedeas* of the writ of mandamus, and the service of that writ was a nullity, and imposed upon the defendants no obligation to obey it.

IV. The counsel insisted that the defendants had not been guilty of a contempt, for it was not in their power to admit the relator, inasmuch as they had made a contract with Mr. Green to occupy the pulpit till the twenty-seventh of May next, which they could not rescind. As Green was in possession, they could not remove him, and, of course, could not admit the relator.

*Lord & Child*, in support of the motion for an attachment, insisted: —

I. That the notice of a purpose to bring a writ of error, before the mandamus issued, is a matter of no consequence, and can, in no respect, affect the rights or obligations of the parties.

II. That a writ of error would not lie at common law, to

the determination of a court awarding a peremptory writ of mandamus.

A writ of error lies upon a final judgment alone, technically and legally considered. Upon a determination not amounting to a final judgment there can be no writ of error. An award of a peremptory mandamus, is not a final judgment, on which error is predicable. Not a case can be found where a writ of error has ever been sustained in a case like this, but there are numerous cases where it has been expressly determined that writs of error will not lie. In the case of *The Bishop of St. David* v. *Lucy* (1 Lord Ray. 445), decided in 1699, a writ of error was brought upon the determination of the King's Bench, denying a prohibition, and it was determined by the whole court that it would not lie. The statute made no change in the law in this respect; and in 1723, which was twelve years after the statute was enacted, in *The King* v. *Dean and Chapter of Dublin* (1 Strange, 536), in which a peremptory writ was awarded, it was determined that a writ of error would not lie; and two years after, in 1725, in *King* v. *Hearle* (1 Strange, 626), a similar decision was made. These cases were both carried before the house of lords, and it was solemnly determined, by all the judges of England, that on a judgment awarding or denying a peremptory writ of mandamus, no writ of error will lie. (1 Br. Par. Ca. 73; 3 id. 505.) Chief Baron Comyns lays down the rule unqualifiedly in his Digest (6 Com. Dig., Pleader, 3 B. 7), that a writ of error in such a case will not lie. These cases have been repeatedly referred to in England, and their authority has never been questioned. The best elementary writers treat it as well settled law that error will not lie, and refer to these cases as authority. (1 Chit. Gen. Prac. 791; 2 Sel. N. P. [7th ed.] 1069.) And it is not even doubted in Westminster Hall that the rule is as there stated. The authority of these cases has been repeatedly and expressly recognized, both by the Supreme Court and the Court of Errors in this State. In an analogous case, which was most elaborately discussed, and decided, of *Yates* v. *The People*

(6 John. 378), KENT, Chief Justice; THOMPSON, SPENCER, VAN NESS, and YATES, Justices; LANSING, Chancellor, and CLINTON, Senator, severally gave opinions, displaying great learning and ability; and every one of these recognized the authority of the English cases named, and treated it as a well settled rule of law in this State, that upon the award or denial of a writ of mandamus no writ of error will lie. The same cases were again referred to, and the same principle asserted in the case of *Classon* v. *Shotwell* (12 John. 31); and though these cases were decided by a divided court, it was admitted by the whole court, and expressly admitted by the opposing counsel, that a writ of error would not lie in the case of mandamus.

But in the case of *The People* v. *Brooklyn* (13 Wend. 130), this precise question was brought before the Court of Errors, in just such a case as the present, and it was expressly decided, and an opinion drawn up by the chancellor, unanimously adopted, that, upon the determination of the court awarding or denying a peremptory writ of mandamus, a writ of error will not lie. In a later case, before the same court, *Ex parte Fitzgerald* (23 Wend. 648), the same rule was recognized and reaffirmed. In the Supreme Court of Massachusetts, in the case of *Strong, petitioner* (20 Pick. 484, 497) the same rule is referred to, and treated as settled law in that State.

III. But assume that, under the organization of our Court of Appeals, a writ of error will lie in this case, for the removal of the judgment to that court; and assume that this court would do what the defendants request it to do, and cause a formal demurrer, and joinder in demurrer, and judgment thereon to be entered (although such a thing could not be done consistently with truth), yet even then a writ of error would not operate as a *supersedeas*. There has been no order of the judge allowing the writ that it should so operate, nor had he any authority to make such order. The counsel for the defendants insist upon the broad principle, that a writ of of error, *per se*, is a *supersedeas*. That a writ of error supersedes an execution upon a judgment is admitted; but because

it supersedes an *execution*, it by no means follows that it does a *writ of mandamus*.

The very idea of a *supersedeas* of this writ, is inconsistent with the nature and object of it. It was introduced, and has ever been preserved, as a prerogative writ, to prevent disorder in the commonwealth, from a failure of justice, or a defect of police. Its issue is wholly a matter of discretion. It is granted only when there is no legal relief to the citizen, and when, in justice and good goverment, there ought to be relief.

But, aside from the obvious absurdity of the claim, it is well settled, by authority, that error, in cases where a judgment on pleadings has been rendered, on which it is agreed error will lie, the writ of error is no *supersedeas* to the writ of mandamus. It supersedes the execution, but not the writ. This is expressly decided by Lord Chancellor Cowper, and the three chief justices, whom he called to his assistance, in 1 Peere Williams, 349. It is admitted by counsel, and affirmed by the court, in the case in 1 Strange, 543. It was so decided in the case of *Strode* v. *Palmer* (Lill. En. 248; 1 Strange, 538). Clinton, Senator, in *Yates* v. *The People*, 464, expressly asserts that a writ of error can be no *supersedeas* of this writ. There is not a contrary authority to be found.

IV. The claim set up, that the contract made by these defendants with Mr. Green, should excuse them from the charge of contempt, is utterly groundless.

On the sixth day of March, Judge EDMONDS delivered in the case the following opinion:

I have examined the question presented to me on this motion with great care; for I am not ashamed to confess that I knew very little about the matter, how far the writ of error, of itself, was a *supersedeas* at common law, irrespective of any statutory provision; and I have bestowed upon it all the labor that my other duties would allow — for I hold, with Lord MANSFIELD: "never to give a judicial opinion upon any point, unless I think I am master of every material argument and authority relative to it. It is not only an act of justice,

due to the public and the parties, to weigh well the grounds and reasons of the judgment, but it is of great consequence to explain them with accuracy and precision in open court, especially if the questions be of a general tendency, that the law of the land may be certain and known."

My examination on that point, as it has turned out, was not necessary to the determination of the motion before me, but it has enabled me to feel that I am master of every argument and authority bearing on the motion, and to arrive at a very clear conclusion in my own mind, as to what my duty is in deciding it. I have been the more careful to give this subject all the consideration necessary to enable me to determine it accurately, because the position assumed by the very respectable counsel for the defendants struck me so forcibly, on the argument, and caused the inquiry constantly to occur, whether it was possible, that the law at this day (unless by express enactment of statute) did authorize a party, against whom a solemn decision of this court had been pronounced, at his own volition, and without the intervention of any court or officer of justice, to arrest that judgment and stay its execution? It would cumber my opinion too much to state here the process or the results of an inquiry which has led me so far back into the annals of our jurisprudence, for the first act in relation to writs of error was passed in the reign of William I., between A. D. 1066 and A. D. 1087. I must content myself with stating the result as it bears on the question before me.

The writ of mandamus has two aspects, one under the statute, and the other at common law. Its power in both cases is alike, but the proceedings in the two cases are different, as is the mode of reviewing and correcting any error which may occur, either in those proceedings or in the final determination.

Under the statute (2 R. S. 586, § 54), the relator, on the coming in of the return to the alternative writ, may plead or demur thereto, whereupon such proceedings may be had as to make up a record of the final judgment. On a judgment thus made up, and flowing from proceedings thus authorized

71—vol. 1.

by the statute, I entertain no doubt that a writ of error would lie.

The mandamus was originally regarded as in the nature of criminal process, and in some of the States it is so yet. (*State* v. *Bruce*, Const. R. 165, 174; S. Car.) But in our State it is, doubtless, civil process. The part of our Revised Statutes relating to writs of mandamus and prohibition is the second title to the ninth chapter of the third part, which part is "An act concerning courts and ministers of justice, and proceedings in civil cases." The third title of that chapter relates to writs of error which are given "upon a final judgment or determination in all civil cases." (2 R. S. 591.) That, however, is not this case, inasmuch as the statutory proceedings have not been taken here, and consequently there cannot be any record of final judgment on which the writ of error could operate. The proceeding has been wholly on the common law side, and the decision has been that of a special motion which cannot be reviewed upon a writ of error. It may be, as this court intimated in *The People* v. *Commissioners of Highways of Hudson* (6 Wend. 559), that permission may be granted to put in a formal demurrer, and so perfect a record of final judgment, for the purpose of furnishing aliment for a writ of error, but that has not yet been done. A motion for that purpose is now before me in which I have some doubts, because the remarks in 6 Wend. were *obiter*, and the propriety of that course has elsewhere been doubted. But whatever may be the conclusion to which I shall arrive in that regard, this case is not yet, and was not when the writ of error was allowed, in that condition, and was not, therefore, one on which the writ of error under the statute could be brought.

Looking at the proceedings in this case, then, in their true light, as under the common law, it seems to me to be established beyond question that a writ of error will not lie. I do not mean to be understood as claiming that the decision of this court, awarding a peremptory mandamus, is final, and cannot be reviewed. Besides the mode of review indicated in

the case in 6 Wendell, it may also be obtained by certiorari, and in some instances on special motion, as in the case in 1 Caines' R. 8. It is enough for the purposes of this motion that the writ of error will not lie; and if it does not lie, it will not, of course, supersede the execution of the peremptory mandamus.

In 2 Saunders' R. 101, note *a*, it is said, "a writ of error would not lie at common law, to review the decisions or judgments of the Court of Queen's Bench, or courts of the counties palatine, in respect to writs of mandamus, and the proceedings thereon. But this is remedied now by Stat. 6 and 7 Vict. ch. 67;" and the reason given is, that regularly no writ of error doth lie unless there be a judgment, or an award in the nature of a judgment; for the words of the writ are "*si judicium redditum sit,*" etc. (Co. Litt. 288 *b.*)

This position seems to be abundantly sustained by authority. In the case of *The Dean and Chapter of Trinity Church, in Dublin* (8 Mod. 28, 1 Stra. 543), when it was before the King's Bench, where it had been brought on a writ of error to the King's Bench in Ireland, the writ of error was quashed, because it would not lie on a mandamus, and one among the reasons assigned was, because "the right of any person was not determined on a mandamus. It gives a remedy where there is a seeming probability for it, and it settles people in their possessions, so that they may be able to defend their rights, or by virtue thereof, to bring an action for things incident to the possession; and if a writ of error would lie in such a case, it would entangle all the public acts of annual officers in most corporations and parishes."

That case was taken to the house of lords, and the decision of the King's Bench there affirmed. (2 Bro. P. Ca. 555.) The same question was again before the house of lords the next year, in *Pender* v. *Herle* (3 Bro. P. C. 178) and the same decision was again made. These cases were before our Revolution, and were therefore, under our Constitution, the law of the land. They are so yet, unless the statute has altered the rule, and I am bound by them as the law of this case, which

I am not at liberty to disregard. The rule has not, however, gone without its sanction in our own courts. In *Yates* v. *The People* (6 J. R. 335), in our Court for the Correction of Errors, these cases were commented on by the Chancellor, Ch. J. KENT, Judges SPENCER and THOMPSON, and by DE WITT CLINTON, Senator, and by all of them regarded as well settled law. Upon what pretense can I regard it otherwise?

There is, however, another view of this case that ought to be taken.

I have already said that the writ of mandamus is, in our State, a civil process, and that the writ of error, when it goes to it, goes as in a civil case. Now our statute (2 R. S. 597, § 30) expressly enacts that in civil cases no writ of error shall stay the issue of an execution, or stay proceedings on an execution issued, unless an order to that effect, by the officer allowing the writ, shall have been made and served. No such order has been obtained in this case, nor was there any authority, in the officer allowing the writ, to make any. Our statute has pointed out, with great precision and care, the cases in which a writ of error may operate to stay proceedings. Proceedings on a mandamus do not come within its provisions. So that even if the writ of error did properly lie in this case, it could not, under our statute, stay the proceedings.

While, then, ample provision has been made for reviewing any decision which this court may make in awarding a mandamus, no provision has been made for staying proceedings upon it, pending the review. On the other hand, the statute has declared that when judgment shall be given for the person suing out the writ, " a peremptory mandamus shall be granted to him *without delay*." (2 R. S. 587, § 57.)

This is by no means an accident in the statute; it is a wise and necessary provision, and is utterly at war with the claim asserted on the part of the defendants on this motion.

The denial or grant of a mandamus is a mere award of the court, not a strict and formal judgment. (3 Bro. P. C. 178.) It settles no right, it merely determines possession. (1 Stra.

The People, ex rel. Griffen, v. Steele and others.

543.) Can it be that the party against whom that determina-
tion may be, has the right at his option, by delay, to defeat it?
The writ was devised and extended to prevent disorder from a
failure of justice, and defect of police. (3 Burr. 1265.) May
he, whose disorder it aims to curb, at his pleasure disarm it of
its authority? Its main purpose is a speedy and summary
administration of justice. May he, against whom it is
launched, say to its speed, "*Festina Lente!*" and convert its
summary character into a protracted and tedious litigation?

I know of no instance where a party, against whom a sol-
emn judgment of a court of competent and general jurisdic-
tion has been pronounced, can, at his own pleasure, without
the interposition of any minister of justice, nullify that judg-
ment so far as to arrest its execution. I have taxed my
memory in vain for the knowledge of any such case; and the
existence of any such right, in any case, would so strike at
the very foundation of the administration of justice, and
would so render courts a mere mockery, by placing their adju-
dications at the mercy of those against whom they may be
pronounced, that I cannot persuade myself that my memory
is at fault as to the existence of any such case in the present
state of the law.

There are, it is true, many cases in which officers of justice,
out of court, are authorized, on the application of the defeated
party, to arrest the execution of a judgment of the court, but
that is only when authorized by, and in strict conformity to,
the well established practice of the court, or some statutory
enactment. If a party wishes merely for time to put in his
pleading, or to make out a case to procure a review of his trial,
or to move to set aside an execution irregular on its face, he
cannot, of his own mere volition, stay any proceedings; he
must seek the interposition of some officer of court. Can it
be that any greater right exists by suing out a writ of error
which issues of right and of course, in a case of a solemn
judgment of this court, pronounced in a proceeding, the whole
object of which is a summary and speedy award of justice?

There are many instances known to our law, where sum-

mary proceedings are provided for the attainment of speedy justice, where there is no power, not only none in the parties, but none in any court, to stay the proceedings on the final adjudication, such as convictions for vagrancy, proceedings to remove a tenant holding over after his term expires, decisions on the writ of habeas corpus, and the like.

Can it be that a right, denied not only to the parties, but even to the courts, in such cases, is yet possessed by the party in respect to a writ of so high a character, that it can be issued by the Supreme Court alone? that court whose peculiar business it is to superintend all other inferior tribunals, and therein to enforce the due exercise of those judicial or ministerial powers with which they have been invested; and this not only by restraining their excesses, but also by correcting their negligence, and obviating their denial of justice (3 Bl. Com. 110); and which exercises these high functions by means of a writ which had its origin in Magna Charta (3 Bac. Abr. 528); and which attained some of its most remedial qualities in those times when the bill of rights came into existence; when the liberties of the subject were asserted in more clear and emphatical terms; when the superiority of the law over the king was maintained; and when tender consciences were indulged with every religious liberty consistent with the safety of the State? (4 Bl. Com. 433.)

I repeat it, I know of no such principle in the law, nor can I conceive how it can exist without depriving courts of their authority, and wresting from the law its supremacy.

I have been thus careful in examining this case thus at large, because I have not been without the hope, that I could succeed in stating the law with sufficient clearness and precision, to bring a knowledge of its requirements home to all the parties to this controversy, and work upon their minds a clear conviction of their duty to obey its behests. I am apprehensive that some passion has been produced among them, but I cannot persuade myself that the defendants have meant to do more than to assert, in a lawful manner, what they were advised were their rights in the matter.

The People, ex rel. Griffen, v. Steele and others.

I never inflict punishment without pain to myself, but I trust that I shall never be deterred by any such consideration from a full discharge of all my duty. If the defendants shall persist in their disobedience to the writ of mandamus, it will be my duty to inflict such punishment upon them as will not only compel that obedience, but administer to them and to others an admonition to beware how they set the law at defiance.

A full opportunity ought to and shall be afforded to the defendants to review my decisions, and to correct any errors into which I may have fallen, and, in the end, the higher tribunal may award to them restitution of whatever they may have lost through my error. But, in the mean time, the commands of the law must be obeyed by them.

I shall therefore direct, that unless within ten days from this date the peremptory mandamus be obeyed, William Steele, Richard Smith, Potter J. Thomas, Benjamin F. Thomas, and William Barker, the only defendants upon whom the writ was served, and who have neglected or refused to obey it, be attached, for a contempt of court, in disobeying the lawful process thereof, and that they be brought before this court, at its next General Term, to suffer such punishment as the court shall think proper to inflict.

On the 17th of March, *Mr. Child* and *Mr. Whiting* presented proofs to the court, of the service of a copy of the order upon the defendants, and that they still continued to disobey said writ of mandamus, and, therefor, moved the court for an immediate attachment, according to the provisions of the statute. An order to that effect was then made, and an attachment issued and placed in the hands of the sheriff of Kings county, commanding him to take the defendants into custody and bring them before the court, at its General Term, on the first Monday of April, to answer for their contempt, and suffer such punishment as the court should inflict.